**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ROBERT A. AUSTIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 13 C 5990** |
| | ) | |
| **FEDERAL RESERVE BANK OF CHICAGO,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

*Pro se* Plaintiff Robert A. Austin was employed at the Federal Reserve Bank of Chicago as an Assistant Examiner in its supervision and regulatory department from December 8, 2008, until he resigned on May 10, 2013. Austin had disagreements with management, including objections to charitable activities that the Bank encouraged and to certain restrictions imposed on his business travel. He voiced complaints about these matters and ultimately resigned. In this lawsuit, he contends that his former employer violated Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981 by discriminating against him because of his race and sex and by retaliating against him. Both parties have moved for summary judgment [46] [50]. For the reasons discussed below, the court grants summary judgment to the Federal Reserve Bank.

<u>**BACKGROUND**</u>

**A. Local Rule 56.1**

The facts presented here are based primarily on the Federal Reserve Bank's Local Rule 56.1 statement of material facts. (Def.'s Local Rule 56.1 Stat. of Mat. Facts [48], hereinafter "Def.'s 56.1.") Local Rule 56.1 requires that a party opposing summary judgment submit "a concise response" to each of the moving party's statements and "in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(B). Although warned of the need to comply with the

court's rules (*see* Notice to *Pro Se* Litigant Opposing Mot. for Sum. Judg. [49]), Austin did not submit a Local Rule 56.1 statement of his own and instead responded to just a few of the Federal Reserve Bank's submitted facts in his response to the Bank's summary judgment motion. (*See* Pl.'s Resp. to Def.'s Mot. for Sum. Judg. [55], hereinafter "Pl.'s Resp.," 11–16.) Austin did include a statement titled "Undisputed Facts/Material Facts" in his own motion for summary judgment. (*See* Pl.'s Mem. in Supp. of Mot. for Sum. Judg. [51], hereinafter "Pl.'s Mem.," 9–17.) This section contains 80 unnumbered paragraphs; of those, 59 contain no citations to the record at all. The remaining 21 paragraphs do not adequately direct the court to portions of the record supporting his proposed facts, and Austin does not otherwise attempt to corroborate his statements as required by Local Rule 56.1(a)(3). Austin is pro se, but he held a substantial professional position with the Federal Reserve Bank of Chicago and can be expected to comply with the court's rules. *Cf. Greer v. Board of Educ. of City of Chicago*, 267 F.3d 723, 727 (7th Cir. 2001) (noting that a *pro se* plaintiff's failure to comply with Local Rule 56.1 provides sufficient grounds to grant summary judgment to a defendant in an employment discrimination case). The court has, however, reviewed the record in its entirety and will consider Austin's responses to the Federal Reserve Bank's submitted facts where appropriate, along with his deposition testimony. But where the Bank's statements are supported by the record and not challenged with competing evidence, they are deemed admitted.

**B.    Job Responsibilities**

Austin is an African-American male who worked as an Assistant Examiner in the Compliance and Community Reinvestment Act ("CCRA") group of the Supervision and Regulation ("S&R") Department of the Federal Reserve Bank of Chicago[1] from December 8, 2008 until he resigned on May 10, 2013. (Def.'s 56.1 ¶ 3.)    As an Assistant Examiner, Austin

---

[1]    The Federal Reserve Bank of Chicago is one of twelve such banks across the country created by the Federal Reserve Act of 1913. (*Id.* ¶ 1 (citing 12 U.S.C. §§ 222 and 225).) Federal Reserve Banks help to design and implement the country's monetary policy as well as supervise and regulate banks and bank holding companies. (*Id.* ¶ 2.)

was required to travel to banks throughout the Seventh Federal District,[2] conducting examinations of banks to carry out the Federal Reserve Bank's supervisory and regulatory functions. (*Id.* ¶ 25.) Assistant Examiners are also required to participate in the Examiner Commissioning Program. (Def.'s 56.1 ¶ 4.) The Program includes training courses, training modules, and periodic proficiency exams. (*Id.*) Assistant Examiners who successfully complete the program's requirements are promoted to the role of Examiner.[3] (*Id.*)

## C.    Supervisors

Austin had several supervisors while employed at the Federal Reserve Bank. When he started in December 2008, he reported to CCRA New Hires Team Leader Joe Davidson; Davidson reported to Assistant Vice President ("AVP") Dave Ward. (*Id.* ¶ 6.) In May or June 2009, Davidson transferred to a new division, and Austin began reporting to David Kitson, who also reported to Ward. (Def.'s 56.1 ¶ 7.) For a time, Austin reported to various other supervisors not relevant to this case, but by September 2011, Austin was once again supervised by Kitson, who in turn reported to Davidson, who by this time had been promoted to AVP. (*Id.* ¶ 11.) In December 2012, Davidson was promoted again, this time to Vice President of Consumer Compliance,[4] and in January 2013, Lisa Cervone became the AVP. Thereafter, from January 2013 until he resigned in May, Austin reported to Kitson, who reported to AVP Cervone, who reported to Vice President of Consumer Compliance Davidson. (*Id.* ¶ 13.)

---

[2]    The Seventh Federal District includes the states of Illinois, Indiana, Iowa, Michigan, and Wisconsin. (*See* Pl.'s Mem. at 10.)

[3]    Apart from this reference to the training program, the parties have not explained what distinguishes an Assistant Examiner from an Examiner. The court infers that the promotion to the role of Examiner has career and remunerative benefits. The court also understands that both Assistant Examiners and Examiners conduct on-site examinations of banks.

[4]    As Vice President of Consumer Compliance, Davidson supervised the AVPs who supervised Austin. (*See* Supervision and Regulation Organizational Charts, Ex. 3 [46-3] to Def.'s Mot. for Sum. Judg., hereinafter "Def.'s Mot.")

Austin testified in his deposition that in early March 2009, Austin met with Davidson and AVPs Ward and Paulette Myrie-Hodge to discuss an issue regarding Austin's overtime pay and Austin's view that he and Davidson "weren't getting along." (Def.'s 56.1 ¶¶ 61–62.) During this meeting, Austin made no reference to his race or sex. (*Id.* ¶ 62.) Austin believes that after this March 2009 meeting, Davidson instructed his subordinates to "increase[] surveillance" of Austin at work. (*Id.* ¶ 67.) Austin acknowledges, however, that he never heard Davidson instruct an employee to monitor him or to report when Austin came or left the Bank, and no one ever told Austin such monitoring was taking place. (*Id.* ¶ 68 (citing Austin Dep. 276:6–10; 277: 10–13).) Austin believes that Davidson "inappropriately used" results obtained from the Examiner Commissioning training courses, which Austin refers to as "psychological testing," to harass him. (Def.'s 56.1 ¶ 71.) Austin's theory is that Davidson placed him on punctuality counseling to "mentally . . . frustrate me and harass me inside based upon my characteristic trait [identified in the one of the courses]." (*Id.*) Davidson testified that he was never given information concerning Austin's performance in these courses (*id.* ¶ 72), and Austin offers no evidence in support of this theory beyond his suspicion.

## D. Work Performance

In 2009, Austin took his first proficiency examination for the Examiner Commissioning Program. The exam required a minimum score of 70 to pass; Austin received a 71. (*Id.* ¶ 66.) While he acknowledges he has no proof, Austin believes that his first proficiency test (where he scored a 71) reflects racial bias because he heard that there were four different versions of the test and, given his score, Austin thinks he was given the hardest one. (Def.'s 56.1 ¶ 66 (citing Austin Dep. 260:1–264:22).)

During his employment, Austin received two different employment counseling memoranda for violations of Federal Reserve Bank policies. First, on August 3, 2010, he received a memorandum from Kitson and Ward that cited concerns about Austin's punctuality. (*Id.* ¶ 15.) The memorandum identified several instances when Austin had arrived late for work

in the previous few months and announced that Austin would be placed in "punctuality counseling." As part of that counseling, Austin's manager would "begin closely monitoring" Austin's arrival times, and Austin was required to call his manager when he arrived to work. (Punctuality Counseling Memorandum, Ex. 8 [46-4] to Def.'s Mot.) The memorandum warned that if Austin continued to arrive late he would be placed on "punctuality probation." (*Id.*) Austin satisfied the punctuality counseling's requirements and was released on October 28, 2010. (*See* Pl.'s Resp. at 11.)

The following year, on September 6, 2011, Austin received a performance counseling memorandum from Kitson and Davidson. (Def.'s 56.1 ¶ 20.) The memorandum first noted that it was intended to "formally document[] the initiation of performance counseling requirements as a result of inconsistent performance throughout the examiner commissioning process, specifically the Job Based Knowledge and Implementation and Communication competencies." (Performance Counseling Memorandum, Ex. 12 [46-4] to Def.'s Mot.) The memorandum stated that during the roughly two-month performance counseling period, Austin's work performance would be evaluated to ensure that he was "consistently demonstrating an independent approach to the work at the level of Assistant Examiner;" that he would need to meet with his supervisors in person to update them on his work; and that if his work continued to fall below expectations, he would be placed on probation. (*Id.*) Austin believes he received this performance counseling memorandum because he is a black male and that Davidson issued the memorandum to harm Austin's reputation. (Def.'s 56.1 ¶ 21.) Austin was released from performance counseling on December 6, 2011. (*Id.* ¶ 22.)

Austin received feedback on his job performance in the form of annual reviews that were prepared by his team leaders with input from the AVPs. The performance reviews used a five-tier rating system: "Outstanding;" "Commendable;" "Effective;" "Needs Improvement;" and "Did Not Meet Goals." (2009 Performance Review Results, Ex. 4 [46-4] to Def.'s Mot.) In 2009 and 2010, Austin received annual performance ratings of "Effective." (Def.'s 56.1 ¶¶ 14, 19.) In

2011, Austin received a performance rating of "Needs Improvement." (*Id.* ¶ 23.) Kitson prepared this evaluation with input from Davidson, who by that time had become AVP. (*Id.*) In 2012, Austin's performance rating returned to "Effective."[5] (Def.'s 56.1 ¶ 24; Pl.'s Resp. at 12.)

## E.     Austin's Concerns with the Federal Reserve Bank's Community Outreach Programs

The Federal Reserve Bank of Chicago coordinates with charitable organizations to provide volunteer opportunities for the Bank's employees. One of the organizations the Bank includes on its list of community outreach opportunities is the Center for Halsted. (January 25, 2013 E-mail Chain, Ex. 35 [46-5] to Def.'s Mot.) According to the Federal Reserve Bank, the Center for Halsted is "dedicated to . . . securing the health and well-being of the Lesbian, Gay, Bisexual, Transgender, and Queer ["LGBT"] people of Chicagoland." (Def.'s Mem. in Supp. of Mot. for Sum. Judg. [47], 8.) On January 7, 2013, Austin sent an e-mail to a communications representative in his department to voice his disapproval of certain of the Reserve Bank's voluntary community outreach activity offerings for 2013, including the Center for Halsted. In the e-mail, Austin stated, in part:

> I don't agree or support the activity offered for the Center for Halsted; upon reading the description of the activity, it appears the bank is supporting a program whose focus is on someone's personal sexual preference, be it in accordance with, or not with someone's personal religious values. Although, I have not led a devout Christian life, based upon my religious background, I would be uncomfortable if I was required to attend this activity[.]"

(January 25, 2013 E-mail Chain, Ex. 35 to Def.'s Mot.) In the e-mail, Austin did not mention that he felt he or anyone else was being discriminated against. (Def.'s 56.1 ¶ 63 (citing Austin Dep. 351:5–352:21).)

Also in January 2013, Austin told Davidson that he objected to Davidson's posting a 7FLAG emblem[6] outside Davidson's office. (Def.'s 56.1 ¶ 64.) Austin believed the flag "was an

---

[5]     It is undisputed that Davidson had no input on Austin's 2009, 2010, or 2012 reviews. (Def.'s 56.1 ¶¶ 14, 19; Pl.'s Resp. at 12.)

[6]     This is the rainbow flag emblem of LGBT community. (Def.'s 56.1 ¶ 64.)

intimidation factor that anybody who didn't agree with it could possibly face the consequences of whatever his [wr]ath would be given that it wasn't a consistency that he displayed this emblem before he got promoted." (*Id.* ¶ 65 (citing Austin Dep. 354:14–18); *see also id.* (citing Austin Dep. 349:7–10) ("I felt that [the flag] was intimidating for anybody who has an opposing opinion to that particular perspective.").)

## F.    Travel Policy Changes

Examiners and Assistant Examiners at the Federal Reserve Bank periodically travel to banks throughout the Seventh Federal District to conduct examination of those banks. Depending on the size of the bank and the type of review being conducted, anywhere from two to eleven Federal Reserve Bank Examiners would travel to a bank to conduct the on-site review, which could last for several days. (*Id.* ¶ 25.) Prior to April 5, 2013, Examiners were not required to stay at the same hotel when they traveled—though most did stay at the one recommended by the Examiner in Charge.[7] (Def.'s 56.1 ¶¶ 26–27.) Austin, however, did not stay at the recommended hotel, which was typically one in the Marriott hotel chain. (*Id.* ¶ 27.) He testified that after he had a bad experience staying at the recommended hotel in Washington D.C., a Marriott, in January 2009, he made "a conscientious decision to myself, a vow to myself that I'm going to boycott that chain and never stay there again[.]" (*Id.* ¶ 28.) In his deposition, Austin refused to elaborate on what happened at the Marriott in D.C. that caused him to vow never to stay at one again. (*Id.* (citing (Austin Dep. 84:7–85:6, 89:2–92:7).) In any case, after January 2009, Austin always chose to stay at a hotel separate from the other Federal Reserve Bank employees during on-site visits and would drive himself from his hotel to the bank rather than carpool with other Examiners. (*Id.* ¶¶ 29–30.) Indeed, regardless of what the recommended hotel was, Austin chose to stay at a hotel within the Holiday Inn hotel chain. (*Id.* ¶ 29 (citing Austin Dep. 88:21–89:1; 92:20–23).)

---

[7]    The parties do not explain the role of an Examiner-in-Charge ("EIC"). The court gathers that the EIC has some type of leadership role during on-site bank evaluations.

At a staff meeting on April 5, 2013, Kitson announced changes to the Federal Reserve Bank's travel policy. (*Id.* ¶ 31.) The new policy required all Examiners traveling to a bank examination to stay at the same hotel recommended by the Examiner in Charge and to carpool together from the hotel to the bank. (Def.'s 56.1 ¶ 32.) Examiners were now required to seek prior approval if they wished to stay at a different hotel, and approval would be granted only under limited circumstances, such as when an early departure to a bank was required. (*Id.*) This new travel policy applied to all Examiners. (*Id.* ¶ 34.) The "same hotel" and "carpooling" provisions that were ultimately incorporated into the revised travel policy were originally suggested by Davidson, based upon his "knowledge of the examination process and related travel," but the policy changes went through review and endorsement by higher level Federal Reserve Bank officials. (*Id.* ¶ 33.)

Austin was not happy about the travel policy changes. The same day the new policy was announced, Austin invited anyone who wanted "to discuss the travel policy concern" to meet with him in a conference room adjacent to Davidson's office. (Def.'s 56.1 ¶ 35.) Three other employees did join Austin in the conference room, but Davidson interrupted the meeting to say that any employee with concerns about the new policy should come and speak with him. (*Id.* ¶ 36.) After Austin's meeting ended, he went to Davidson's office to discuss the issue further. As Austin tells it:

> And what happens is because—we discussed the fact of the—you know how there was that flu virus outbreak, H1N1, you know, back in the day, so I saw used [sic] that as an example that how the current travel policy of carpooling and same hotel could expose some inherent risks to our staff especially when it comes to health as well as safety. So he definitely agreed that, you know, I can understand in an epidemic situation like a flu, you know, that I could see your point on that. And then what I agreed to do was to provide him with a list of reasons as to why that this [sic] travel policy should be modified. And it's at that point where we adjourn the meeting from in his room, and I go back with the focus of writing a letter which I entitled a concerns letter, and this is where I'm taking the opportunity to identify concerns or problems that I see with this current travel policy.

(*Id.* ¶ 37 (citing Austin Dep. 106:22–107:17).)  Later that same evening, Austin did indeed write an e-mail message to Kitson and Davidson and attached a three-and-one-half page document called "Concerns."  (*Id.* ¶ 38.)  The "Concerns" memo did not discuss or reference race or sex. (Concerns Memorandum, Ex 15 [46-4] to Def.'s Mot.)  It suggested alternatives to the new travel policy, such as permitting employees to stay at the hotel they preferred if they were willing to forfeit per diem and mileage reimbursement.  (*Id.*)  The document also reiterated Austin's concerns about health-related issues associated with carpooling.  (*Id.*)  In the remaining portions, Austin offered his opinion on various productivity issues associated with the Reserve Bank and noted his disapproval of the Examiners' conducting off-site review of banks in certain circumstances.  (*Id.*)

Austin forwarded this document to Pamela Rieger, Vice President in the Human Resources division of the S&R Department.  (Def.'s 56.1 ¶ 39.)  On April 16, 2013, Austin met with Rieger and Cindy Gendry, Senior Employee Relations Representative, to discuss the Concerns memo.  (*Id.* ¶ 40.)  At the meeting, Austin requested that he be permitted to stay at a hotel of his choosing while traveling to on-site banks and that he be authorized to decide who would ride in his car while traveling for work.  (*Id.* ¶ 42.)  As he explained:

> The only special accommodation that I wanted was the opportunity to determine where I stayed at and the opportunity to decide if I want to let somebody else ride with me.  Because if you're coughing and sneezing, you're not getting into the car with me like that, and if I choose to let you in, you know, that would be on me at my risk, but that's my determination.  You can't require it, you can't require me to expose myself to that, I make the decision what I want to expose myself to.

(Austin Dep. 141:16–142:2.)  Shortly after this meeting, Austin e-mailed Rieger and Gendry an updated version of his Concerns memo, which included a new section called "Appendix A." (Def.'s 56.1 ¶ 46.)  The appendix offered a new reason why the new travel policy was unwise: "**Racial tension** is another concern that cannot be overlooked or left unrecognized; this is why it is also imperative that examiners be able to select their hotel with comparable cost due to the

associated targeted acts of racial injustice and discriminatory behavior that can arise, in certain areas[.]" (*Id.*) (emphasis in original).

Austin, Rieger, and Gendry met again on April 19, 2013. (*Id.* ¶ 47.) At this meeting, Gendry told Austin that the Federal Reserve Bank would not be able to make a special accommodation for Austin. (*Id.*) Austin then asked, "how much time do I have left before I'm let go because I'm not going to comply with this new policy because I don't agree with it." (Def.'s 56.1 ¶ 48.) Rieger responded, "oh, we weren't expecting you to say that," and suggested they all meet again on May 6, 2013, and Austin agreed to do so. (*Id.*) Austin was allowed to stay at a Holiday Inn, not the recommended Super 8 Hotel, for the last bank examination he worked, which started on April 22, 2013. Austin did not seek reimbursement for these expenses, even though the Federal Reserve Bank was prepared to pay them. (Def.'s 56.1 ¶ 49; Pl.'s Resp. at 13.)

## G.      Formal Complaint and Lawsuit

On Sunday, April 21, 2013, Austin e-mailed to Rieger and Gendry a four-page document called "Formal Complaint" that included the following section headings: "805 Intimidation and Harassment," "Retaliation," "Disparate Impact," and "Disparate Treatment." (Def.'s 56.1. ¶ 50; *see* Formal Complaint, Ex. 20 [46-5] to Def.'s Mot.) This document described incidents of what Austin believes was unfair treatment at the Federal Reserve Bank. For example, under the heading "Retaliation," Austin recounted an "altercation" he had with Joe Davidson in 2009 about overtime pay. (Formal Complaint, Ex. 20 to Def.'s Mot. at 1.) Austin does not elaborate on the nature of this altercation in the Formal Complaint but explains that because of this history, when Davidson returned as an AVP in his department, it "creat[ed] the environment for retaliation." (*Id.*) Under the heading "Disparate Impact," Austin flagged his disagreement with the new travel policy and reiterated the "racial tension" concern he had mentioned in the Concerns memo. (*Id.* at 1–3.) Lastly, under the heading "Disparate Treatment," Austin complained about his department's participation in a pilot program that introduced new ways to evaluate banks for

compliance with the Federal Reserve Bank's regulations. Austin believed that he and other staff members should not be penalized to the extent they did not fully grasp the pilot program's concepts because when they began the Examiner Commissioning Program the pilot program did not exist. (*Id.* at 3–4.) This section does not refer to any personal discrimination he suffered because of race, sex, or other protected characteristic. (Formal Complaint, Ex. 20 to Def.'s Mot. at 3–4.)

On Tuesday, April 23, 2013, Gendry replied to Austin by e-mail, assuring him that his "formal complaint has been received and will be investigated. Someone from HR will follow up with you in the near future regarding the investigation." (Def.'s 56.1 ¶ 51.) On May 6, 2013, Austin met with an Employee Relations representative to discuss the Formal Complaint. (*Id.* ¶ 54.) At the start of this meeting, before any substantive discussion of his complaints, Austin gave the representative a letter of resignation. (Def.'s 56.1 ¶ 56 (citing Austin Dep. 161:11–13).) Austin went home immediately and never returned to work at the Federal Reserve Bank. (*Id.* ¶ 58.) He was paid through May 10, 2013. (*Id.*) On June 7, 2013, the Employee Relations representative sent Austin a letter informing him, in part, that the "investigation into your [written] complaint [from April 19, 2013] has been completed" and that the "result of the investigation is that no evidence was found to validate any of your claims of harassment. Accordingly, the investigation is closed." (*Id.* ¶ 59.)

Austin filed a discrimination complaint with the United States Equal Employment Opportunity Commission ("EEOC") on June 11, 2013. (*See* Compl. at 6.) The complaint read, in total, as follows:

> I was hired by Respondent on or about December 8, 2008. My most recent position was Assistant Examiner. During my employment, I was subjected to harassment, stalking, intimidation and different conditions of employment, including but not limited to, training, discipline, inappropriate use of psychological testing. I was also subjected to racially bias testing, travel policy, credit checks and background investigations. I complained to Respondent but to no avail. After I complained, I was constructively discharged.

> I believe I had been discriminated against because of my race, Black, my sex, male and in retaliation for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended.

(*Id.*)  The Commission issued a notice of a right to sue on June 28, 2013.  (*Id.* at 7.)   Austin filed the current lawsuit on August 22, 2013, which cross-references his EEOC complaint.  (Compl. at 1, 3–4.)  Austin seeks $300,000 in damages resulting from his discrimination, his remaining 2013 salary in compensatory damages, $100 million in punitive damages, and various other forms of relief.  (*Id.* at 1.)

## DISCUSSION

### A.   Summary Judgment Review Standards

The court will grant a motion for summary judgment when "there is no genuine dispute as to any material fact" such that "the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The court "construe[s] all facts and draw[s] reasonable inferences in the light most favorable to the nonmoving party." *Righi v. SMC Corp.*, 632 F.3d 404, 408 (7th Cir.2011). Summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir.2008) (internal quotation marks and citation omitted).  Conclusory allegations of discrimination therefore cannot defeat a summary judgment motion. *See Fischer v. Wayne Dalton Corp.*, 139 F.3d 1137, 1140 (7th Cir. 1998). The fact-intensive nature of employment discrimination cases necessitates that the parties highlight those facts favorable to their cases, for the law does not oblige the district court to "scour the record" in search of disputes that might help a plaintiff avoid summary judgment.  *Greer v. Bd. of Educ. of the City of Chi.*, 267 F.3d 723, 727 (7th Cir. 2001) (citation omitted).

### B.   Retaliation Claims

Section 1981 "prohibits . . . retaliation against employees when a contractual relationship exists between the employer and employee."  *Davis v. Time Warner Cable of S.E., Wis., L.P.*, 651 F.3d 664, 671 (7th Cir. 2011).   A claim of discrimination or retaliation under § 1981 is

evaluated under the same standards as are applicable to claims under Title VII. *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 n.2 (7th Cir. 2014).[8] Under those standards, retaliation can be established either by presenting evidence of a causal link between protected activity and an adverse employment action (the "direct method," *see Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012)), or by presenting evidence that a similarly-situated employee who did not engage in protected activity was treated more favorably (the "indirect method," *see Silverman v. Bd. of Educ. of Chi.*, 637 F.3d 729, 742 (7th Cir. 2011)). Under either of these rubrics, Austin must establish that he engaged in protected activity and that his employer took adverse action against him as a result. As explained below, while Austin has presented evidence that he engaged in one protected activity, the evidence is insufficient to show that he suffered any adverse employment action as a result.

### 1.    Protected Activity

As protected activity for which he suffered retaliation, Austin cites four instances of "opposition" to unlawful conduct. With one exception, these events do not constitute statutorily protected activity as a matter of law. In March 2009, Austin met with Davidson and two Reserve to discuss an issue related to the tracking of Austin's overtime pay and to allow Austin to voice his concern that he and Davidson "weren't getting along." (Def.'s 56.1 ¶¶ 61–62.) In his deposition, Austin admits he did not complain that Davidson's actions were racially motivated or that Davidson treated Austin differently because Austin is a male. (Def.'s 56.1 ¶ 62 (citing Austin Dep. 309:18–310:12; 309:5–311:9).) This event does not therefore constitute protected activity as a matter of law. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) ("Merely complaining in general terms of discrimination or harassment, without indicating

---

[8]     The court notes that certain events discussed in this section took place more than 300 days prior to Austin filing his EEOC charge, which means claims premised on these events are untimely for Title VII purposes. *See* 42 U.S.C. § 2000e–5(e)(1). Section 1981 has a four-year statute of limitations, however, *Smith v. Bray*, 681 F.3d 888, 896 n.2 (7th Cir. 2012), and so even though Austin has not been clear about which law he intends to use, the court's analysis presumes Austin presses a § 1981 claim when a Title VII claim would be untimely.

a connection to a protected class or providing facts sufficient to create that inference, is insufficient [to establish that plaintiff engaged in a protected activity under Title VII]."); *cf. Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 658 (7th Cir. 2012) (concluding, in an age discrimination case, that "general complaints" to supervisors do not constitute protected activity because the employee did not complain about discrimination *based on* a protected characteristic).

Next, on two separate occasions in January 2013, Austin expressed opposition to certain aspects of the Federal Reserve Bank's community outreach programs. Austin sent an e-mail to his Department's communications representative, voicing his disapproval of offering outreach opportunities at the Center for Halsted, which focuses on advocacy for the LGBT community in the Chicago area. (January 25, 2013 E-mail Chain, Ex. 35 to Def.'s Mot.) In his e-mail, Austin stated that he would be uncomfortable if required to go to the Center for Halsted because of the nature of Center for Halsted's advocacy. (*Id.*) Further, Austin told Davidson that he disagreed with Davidson's decision to hang the 7FLAG emblem outside Davidson's office; Austin testified that he felt that hanging the flag was "intimidating for anybody who has an opposing opinion to that particular perspective." (Def.'s 56.1 ¶ 65 (citing Austin Dep. 349:7-10).) Austin argues that "some individuals in the position of Power within the [Reserve Bank], resented Plaintiff for [sending the e-mail], and thereby Retaliated against Plaintiff." (Pl.'s Resp. at 4.) Title VII and § 1981 retaliation suits protect people who complain "about the types of discrimination" those laws prohibit. *Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000). Expressions of animus, or even simply distaste, for the LGBT community does not constitute protected activity under the anti-discrimination laws. Austin's actions appear to reflect his own biases against gay and lesbian men and women, rather than his objections to unlawful discrimination.

Finally, Austin submitted the Formal Complaint on April 21, 2013. Filing a formal complaint constitutes protected activity for the purposes of anti-discrimination laws when the

complaint states that the alleged discrimination occurred because of some protected characteristic, such as race or sex.  *Tomanovich*, 457 F.3d at 663.  In the Formal Complaint, Austin claimed he was retaliated against "through the use of discriminatory practices such as Disparate Treatment and Disparate Impact."  (*See* Def.'s 56.1 ¶ 50.)  The Formal Complaint is short on specific instances where Austin was treated differently *because* of his race or sex, but the court construes his *pro se* submissions liberally.  He did discuss "racial tension" as a reason why the new travel policy has a "Disparate Impact" on himself, and presumably on others.[9]  The court concludes that the Formal Complaint constitutes protected activity.

## 2.      Adverse Employment Action

Regardless of whether Austin can establish that he engaged in a protected activity, though, he cannot show that the Federal Reserve Bank subjected him to any materially adverse employment action as a result.   "Adverse employment actions for purposes of the federal antidiscrimination statutes generally fall into three categories: (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge."  *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir. 2011).  The test is more flexible in a case alleging retaliation.  In such a case, "the adverse action or harm that an employee suffers will not always be employment-related. . . . Nonetheless, the employee must complain of some action on the employer's part that causes her to suffer a real harm."  *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 902 (7th Cir. 2003).

_____

[9]      His assertion that he was subject to disparate treatment, however, is based on his disagreements with the Federal Reserve Bank's methodology for evaluating persons in the Examiner Commissioning Program.  Austin complains on behalf of himself and "many other staff who have 2–5 years experience," but does not say that the Reserve Bank's methodology discriminates against employees based on protected characteristics.  (*See* Formal Complaint.) This portion of the Formal Complaint thus does not constitute protected activity.

Austin received a punctuality counseling memorandum in August 2010 and a performance counseling memorandum in September 2011, but he was released from each after approximately two months. (Def.'s 56.1 ¶¶ 15, 18, 20, 22.) Austin argues that receiving the memoranda affected his ability to be promoted and his eligibility for increases to his compensation, but he offers no evidence in support of these assertions and has not identified any promotion or salary increases he expected but did not receive. (Pl.'s Resp. at 7.)

The court has reviewed each memorandum, as well as the releases, and concludes that neither constitutes a materially adverse employment action as a matter of law. (*See* Exs. 8, 9, 12, 13 [46-4] to Def.'s Mot.) "[W]ritten reprimands without any changes in the terms or conditions of [Austin's] employment are not adverse employment actions." *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 602 (7th Cir. 2009). In each case, the memorandum did not materially change the terms or conditions of Austin's job. *See Lewis v. City of Chi.*, 496 F.3d 645, 653 (7th Cir.2007) (citation omitted) (concluding that to be actionable, an employment action "must be a significant change in employment status . . . or a decision causing a significant change in benefits."). The punctuality memorandum, after noting several instances over the course of several months when Austin arrived late for work, stated that Austin would be closely monitored for a period and that he would need to check in with his supervisor when he arrived. (Punctuality Counseling Memorandum, Ex. 8 to Def.'s Mot.) The memorandum then advised Austin of further consequences if he continued to arrive late; namely, that he would be placed on punctuality probation. (*Id.*) The punctuality memorandum, then, while warning of potential future adverse action the Federal Reserve Bank might take, was not itself a materially adverse employment action.

The performance counseling memorandum also does not constitute a materially adverse action taken by the employer. It noted Austin's "inconsistent performance" in the Examiner Commissioning Program and identified several examples where Austin was deficient in his job responsibilities. (Performance Counseling Memorandum, Ex. 12 to Def.'s Mot.) The

memorandum stated that during the performance counseling period (which lasted less than two months), Austin would be evaluated, that he would need to meet with his supervisors to update them on his work, and that if his work continued to fall below expectations, he would be placed on probation. (*Id.*) As with the punctuality counseling memorandum, Austin was warned of future potential adverse employment actions, but for the time being, he simply was required to take steps to demonstrate improvement in his performance. *Lloyd*, 552 F.3d at 602. And Austin appears to have done so successfully. The court concludes the performance counseling memorandum was not materially adverse.

Austin also cites his 2011 annual performance review as an adverse employment action; there, he received an overall rating of "Needs Improvement." (Def.'s 56.1. ¶ 23.) The court disagrees. In *Silverman v. Board of Educ. of City of Chicago*, 637 F.3d 729 (7th Cir. 2011), a teacher sued the Board of Education for the City of Chicago, alleging the Board discriminated against her on the basis of her pregnancy and then retaliated against her by giving her negative performance reviews after she filed her charge with the EEOC. *Id.* at 731, 741. The court concluded that "a negative performance evaluation could constitute an adverse action within the meaning of the direct method of proving retaliation."[10] *Id.* at 741. However, the court cautioned that the teacher would still need to show a causal connection between the filing of her EEOC complaint and the negative performance reviews she received months later, after the Board had renewed her teaching contract. *Id.* Because the teacher could not show any connection between her complaint and the performance reviews, she could not prove the defendants discriminated against her. *Silverman*, 637 F.3d at 741.

---

[10] Other Seventh Circuit cases, however, have concluded that a negative performance review, standing alone, cannot constitute a materially adverse employment action. *See, e.g.*, *Volovsek v. Wis. Dep't of Agric. Trade and Consum. Prot.*, 344 F.3d 680, 688 (7th Cir. 2003) ("[D]isputed performance reviews . . . do not, themselves, amount to the kind of adverse employment action that constitutes discrimination or retaliation[.]"); *Brown v. Advocate South Suburban Hosp.*, 700 F.3d 1101, 1109 (7th Cir. 2012) (noting the split of Seventh Circuit authority on the issue). For the purposes of this opinion, the court follows the *Silverman* approach and concludes that a negative performance review under certain circumstances may qualify as a materially adverse employment action.

As in *Silverman*, in this case, Austin cannot show any causal connection between a protected activity and Austin's receipt of the "Needs Improvement" review. Indeed, the only protected activity Austin engaged in while employed at the Reserve Bank was e-mailing the Formal Complaint. This occurred in April 2013, more than a year *after* Austin received the negative review. Austin's inability to show a causal connection between a protected activity and any adverse employment action therefore dooms his retaliation claim.

## C.    Race and Sex Discrimination Claims

Austin claims he was discriminated against because of his race and sex and subjected to "harassment, stalking, intimidation and different terms and conditions of employment, including but not limited to, training, discipline and inappropriate use of psychological testing." (Compl. at 6.) He further alleges that he was "subjected to racially bias [sic] testing, travel policy, credit checks and background investigations." (*Id.*)

Title VII[11] makes it unlawful for employers to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e–2(a)(1). Austin can prove a claim of intentional discrimination either by presenting direct or circumstantial evidence of a discriminatory motive (the "direct method") or by the indirect method of proof. To prove race discrimination under the direct method, Austin must present "direct or circumstantial evidence that creates a convincing mosaic of discrimination on the basis of race." *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 674 (7th Cir. 2012). Alternatively, under the indirect method, Austin must establish that (1) he is a member of a protected class; (2) his job performance met the Federal Reserve Bank's legitimate

---

[11]    Here as well, to the extent certain alleged events occurred more than 300 days prior to filing his EEOC charge and therefore cannot form the basis of a discrimination suit, the court proceeds as if Austin has brought a § 1981 discrimination claim. Section 1981 "prohibits race discrimination in the making and enforcing of contracts." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011); *see Smith*, 681 F.3d at 896 ("The substantive standards and methods of proof that apply to claims of racial discrimination and retaliation under Title VII also apply to claims under § 1981.").

expectations; (3) he suffered an adverse employment action; and (4) another similarly-situated individual outside his protected class was treated more favorably. *Swearnigen-El v. Cook Cnty. Sheriff's Dept.*, 602 F.3d 852, 860 (7th Cir. 2010).

Austin alleges no facts that could even arguably support a race or sex discrimination claim.[12] He claims that he was subjected to a "racially bias[ed]" travel policy. (Compl. at 6.; *see* Pl.'s Mem. at 4 ("The new travel policy, specifically the parameters of 'same hotel' and 'carpooling' requirements was required in reckless disregard of Plaintiff's individual rights.").) But he admits that the travel policy changes "applied to all" employees within his department regardless of race or gender. (Def.'s 56.1 ¶ 34.) In other words, by its terms, the policy was not discriminatory in nature. Nor did it disparately impact persons with protected characteristics, as Austin admitted that he was the "only examiner who primarily stays at separate hotels then [sic] the rest of the examination team." (Formal Complaint, Ex. 20 to Def.'s Mot. at 1.)

Austin further argues that he was disciplined differently because of his race and sex. The court presumes this argument relates to the punctuality and performance counseling and negative performance reviews he received. Austin has not produced any evidence, though, from which the court could infer these memoranda were issued to him because of his race or sex. Austin admitted in his deposition that he did arrive late to work (*see* Def.'s 56.1 ¶ 16), and he does not identify any other employee who also arrived late but did not receive punctuality counseling. (*Id.* ¶ 17.) As for the performance counseling, which Austin believes he received because he is a "black male" (*id.* ¶ 21), there is no evidence that shows other co-workers who displayed similar types of performance and were not placed on counseling. (*Id.* ¶¶ 76–77.)

As to the charges of stalking, harassment, and intimidation *because of* his race or sex, the claims fail for lack of evidence. Austin believes Davidson instructed employees to stalk or harass Austin, and that Davidson subjected him to "increased surveillance," but there is no

---

[12] When Austin was asked in his deposition whether he believed anything adverse occurred to him solely because he was a male, Austin answered: "No. They go together. They go together, black male, black man." (Id. ¶ 60 (citing Austin Dep. 246:11–12).)

evidence of this in the record. (*See* Def.'s 56.1 ¶¶ 68–69.) Further, Austin believes Davidson inappropriately used the results of Austin's participation in various employee development courses to harass him. The unrebutted evidence, however, is that Davidson never received any copies of Austin's surveys or test results from these courses. (*Id.* ¶ 72.) Austin refers to these development courses as "psychological testing," and he claims, without support, that an employee's performance in these courses, documented in what he calls "psychological reports", are "discriminatory tools used to support racism." (Pl.'s Mem. at 6.) This contention is without evidence or merit. And Austin's belief that he was given a harder proficiency exam than other employees because he was black is similarly unsupported. (*See* 56.1 ¶ 66 (citing Austin Dep. 262:6–10) ("I don't believe that the other candidates of the other races would have been subjected to that same degree of test that I have, even though I can't really prove it from that standpoint.").) The record contains no evidence that any of these actions mentioned above were taken because of Austin's race or sex. Accordingly, the court grants summary judgment to the Reserve Bank on Austin's race and sex discrimination claims.

**D.    Constructive Discharge**

After Austin complained to the Reserve Bank, he asserts, he was "constructively discharged." (Pl.'s Mem. at 6.) A constructive discharge "occurs when the plaintiff shows that he was forced to resign because his working conditions, from the standpoint of the reasonable employee, had become unbearable." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). The Seventh Circuit recognizes two forms of constructive discharge. In the first situation, an employee resigns because of "discriminatory harassment." *Id.* But Austin must "show working conditions even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress[.]" *Id.* In the second situation, Austin must show that the employer's actions have communicated to a reasonable employee that he will be terminated. *Id.* But here, as in

the first situation, a plaintiff must still prove that the working conditions had become intolerable. *Chapin*, 621 F.3d at 679.

Regardless of which theory is employed, Austin cannot show that he was constructively discharged because he has not produced any evidence that he was discriminated against on the basis of his race or sex. Austin was clearly upset about changes to the Federal Reserve Bank's travel policy and disappointed that he would not be allowed to continue to stay at a hotel of his choosing. But Austin must show that the working conditions were unbearable from the standpoint of a "reasonable employee" and the evidence is insufficient for such a showing. *Chapin*, 621 F.3d at 679. There is no evidence that any other employee complained about the policy or resigned because of it. Austin was free to resign if he was dissatisfied with the new travel arrangement, which he did, but this does not establish constructive discharge. In the final analysis, "[a]n employee's unhappiness with [his] employer's conduct or decision is insufficient to support a claim under Title VII." *De la Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 686 (7th Cir. 2008).

## CONCLUSION[13]

Austin's motion for summary judgment [50] is denied, and the Federal Reserve Bank's motion for summary judgment [46] is granted. The court enters judgment in favor of the Federal Reserve Bank.

ENTER:

*Rebecca R. Pallmeyer*

REBECCA R. PALLMEYER
United States District Judge

Dated: January 7, 2015

---

[13] Further, the court declines to consider Austin's arguments regarding damages contained in Section Five of his summary judgment motion. (*See* Pl.'s Mem. at 25–26.) The court previously ruled that any damages discovery would be deferred until after it ruled on any summary judgment motions. (*See* Order, Dec. 12, 2013 [23].) Because the court grants the Defendant's motion, Austin's damages discussion is moot.